**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:12-CV-00021**

In the Matter of the Complaint of FOSS
MARITIME COMPANY, as Owner and
FOSS ATLANTIC, INC., as Operator and
Owner, *pro hac vice*, of the M/V DELTA
MARINER, Official No. 1094576, for
Exoneration from or Limitation of Liability

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon the motion of Third-Party Defendant Marquette

Transportation Company Offshore, LLC ("Marquette") to dismiss the third-party complaint filed against

it by Thomas Hines and James LeFevre, pursuant to Federal Rule of Civil Procedure 12(b)(6); in the

alternative, Marquette seeks summary judgment on this claim pursuant to Federal Rule of Civil Procedure

56.  (Docket No. 89.)  Third-Party Plaintiffs LeFevre and Hines have responded in opposition, (Docket

No. 94), and Marquette has replied, (Docket No. 99).  Fully briefed, this matter stands ripe for

adjudication.  For the reasons explained below, the Court will DENY Marquette's motion.

**Factual and Procedural Background**

This lawsuit concerns two allisions involving the Eggners Ferry Bridge ("the Bridge"), owned by

the Commonwealth of Kentucky Transportation Cabinet ("KYTC") and situated in the Kentucky Lake

portion of the Tennessee River. The first occurred on November 15, 2011, as the *M/V Miss Katie*, owned

and operated by Marquette, traveled northbound on the Tennessee River.  While attempting to negotiate

Span E of the Bridge, the *Miss Katie* struck the center portion of the span.[1]  Seventy-two days later, on

January 26, 2012, the *M/V Delta Mariner*, owned and operated by Foss Maritime Company and Foss

---

[1] This allision is the subject of *Allianz Global Risks US Insurance Co. v. Marquette Transportation Co., LLC*, Civil Action No. 5:12-CV-00168-TBR, also pending before this Court.

Atlantic, Inc. (collectively "Foss"), sustained a similar accident.  While attempting to pass through, the *Delta Mariner* struck Span E, which collapsed onto the vessel's bow and into the riverbed.

Foss instituted a limitation action seeking exoneration from, or limitation of, liability.  (*See* Docket No. 1.)  Several parties filed claims related to the allision, including residents who allege losses related to interruption of their usual travel routines, restaurant owners who allege the loss of travel-related business, and a telecommunications company that had a fiber optic cable severed by the accident.  (*See* Docket Nos. 8, 11, 16, 15, and 14.)  Additionally, as the owner of the Bridge, KYTC filed a claim for the cost and expense of replacing the demolished span.  (*See* Docket No. 12.)

At the time it answered KYTC's claim, Foss simultaneously filed a counterclaim against KYTC and a third-party complaint against Defendants Thomas Hines and James LaFevre.  (*See* Docket No. 22.)  During the period relevant to the underlying suit, Hines served as the supervisor of permits and traffic for District One of the Transportation Cabinet, and LeFevre served as the Cabinet's chief district engineer.  Foss alleges that the *Delta Mariner*'s allision was caused by the lack of functional navigation lights on the Bridge, in violation of federal regulations and the United States Coast Guard Bridge Permit ("the Permit") governing the Bridge's operation.[2]  According to Foss, these lights were extinguished due to the negligent acts and omissions of Hines and LeFevre, who purportedly failed to inspect, maintain, and repair them as required.  (*See* Docket No. 22.)  Foss alleges that Hines "was at all material times responsible for the oversight of the repair, maintenance, and inspection of the bridge lights on bridges in District One including . . . those bridge lights required by the United States Coast Guard Bridge Permit that governed the Eggners Ferry Bridge."  (Docket No. 22.)  As to LeFevre, Foss alleges that "he was Mr. Hines' supervisor and also responsible for carrying out the ministerial, non-discretionary obligations contained in

---

[2] Pursuant to federal regulations and the Permit, the Bridge must display a specific configuration of lights and reflective panels.  *See* 33 C.F.R. 118, *et seq.* (describing the lighting and other signals required of bridges over navigable waters; Docket No. 89-9, Excerpt from Bridge Permit; Docket No. 89-10, Bridge Lighting Diagram.  The Permit also required KYTC to implement "a continuing program of inspection and maintenance . . . to insure that the lights and panels are properly displayed."  (*See* Docket No. 89-9, Excerpt from Bridge Permit.

[the Bridge Permit]." (Docket No. 22.) Based on these allegations, Foss seeks contribution or indemnity from Hines and LeFevre.

For their part, LeFevre and Hines deny that the extinguished navigational lights contributed to the accident; they instead allege that Foss's own crewmembers created the risk by negligently and recklessly operating the *Delta Mariner*. (*See* Docket No. 23.) However, Hines and LeFevre contend that should the defective lights be determined to have contributed to the *Delta Mariner*'s allision, Marquette shares the blame. According to Hines and LeFevre, the *Miss Katie*'s allision with the Bridge caused damage to Span E's lower chord and the navigational light fixture attached to it. They allege that any outage on January 26, 2012—the date of the second allision—was proximately caused by electrical shorts caused by the *Miss Katie*'s allision seventy-two days earlier. Should the navigation lights be determined to have caused the *Delta Mariner*'s allision, LeFevre and Hines seek indemnity or contribution against Marquette for any damages. (Docket No. 73.)

Now at issue is the third-party complaint that LeFevre and Hines filed against Marquette, charging that the Bridge's alleged lighting defects are traceable to the *Miss Katie*'s allision. (Docket No. 73.) The Third-Party Plaintiffs contend that the *Delta Mariner*'s crew did not heed the Coast Guard's broadcast notices and failed to utilize its own navigational tools to avoid alluding with the Bridge. Marquette moves to dismiss the third-party complaint, arguing that LeFevre and Hines have not articulated plausible grounds for relief. The company further contends that the doctrine of superseding causation relieves Marquette from any potential liability for the *Delta Mariner*'s allision. (*See* Docket No. 89.)

## Legal Standard

Federal Rule of Civil Procedure 12(b) provides for the dismissal of claims and parties for seven reasons, including dismissal for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Rule 12 continues:

(d) Result of Presenting Matters Outside the Pleadings.  If, on a motion under Rule 12(b) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All the parties shall be given reasonable opportunity to present all material made pertinent to the motion.

Accordingly, Rule 12(d) permits a 12(b)(6) motion to be converted into a motion for summary judgment. Because Marquette has submitted and the Court has considered nine exhibits extrinsic to the face of the complaint—including photographs and diagrams, excerpts from the Coast Guard's public hearing and the Permit, and various depositions—the Court will apply summary judgment standards.  *See Mays v. Buckeye Rural Elec. Co-Op, Inc.*, 277 F.3d 873, 877 (6th Cir. 2002) (district court may consider motion to dismiss as one for summary judgment when invited to consider matters outside the pleadings); *Ball v. Union Carbide Corp.*, 387 F.3d 713, 719 (6th Cir. 2004) (where defendant moves both to dismiss and for summary judgment, plaintiff is on notice that summary judgment is being requested).

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 249 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him.  *See id.* (citing *Anderson*, 477 U.S. at 252).  Mere speculation will not suffice to defeat a motion for summary

judgment:  "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

**Analysis**

**I.      The evidence presented thus far presents genuine issues of material fact inappropriate for resolution on summary judgment.**

In its briefing, Marquette points to three primary grounds for summary adjudication.  The Company first contends that the Bridge's electrical system continued to properly function after the *Miss Katie*'s allision.  It next argues that KYTC failed to take appropriate steps to repair any damage that may have resulted.  Finally, Marquette alleges that KYTC failed to properly train its personnel to respond to such circumstances.  The Court will address each in turn.

**a.  Did the electrical system remain functional after the *Miss Katie*'s allision?**

Marquette first argues that the testimony of KYTC employees contradicts the Third-Party Plaintiffs' claims, rendering them implausible.  Although the Third-Party Plaintiffs claim that the *Miss Katie*'s allision damaged Span E's green navigation light (and perhaps the entire electrical system), Marquette argues that no evidence supports this conclusion.  Instead, both Hines and Josh Ford, a KYTC traffic crew technician, testified that the green light continued to work after the first allision.  Hines observed that although the light was knocked loose from its conduit and hung from the span, it remained illuminated. (*See* Docket No. 89-4 at 25-26.)  Ford confirmed this characterization.  (*See* Docket No. 89-5, Excerpts from Deposition of Josh Ford, at 54, 59, 64-65.)  Had the *Miss Katie*'s allision damaged the Bridge's electrical system, Marquette reasons, Span E's lights would not have continued to operate.  The fact that they remained operative suggests that the Bridge's wiring was not damaged in the first allision.  Marquette finally notes that the Bridge's breaker system was located on shore, and the *Miss Katie* made

5

no contact with it.  Accordingly, Marquette says, it could not have sustained any damage from the first allision.  (Docket No. 89-1 at 19.)

But other testimony suggests that issues of fact remain.  Hines testified that the Bridge sustained outages in the weeks following the *Miss Katie*'s allision.  At deposition, Hines commented, "We started having problems where the breakers were kicking, not all the time, but it was just, I think it was two or three times the breakers kicked before they finally just wouldn't, you couldn't reset them anymore after that allision."[3]  (*See* Docket No. 89-4 at 26.)

Moreover, the preliminary report of Dr. Aleck Leedy, P.E., professor of electrical engineering at Murray State University, controverts Marquette's theory.  (*See* Docket No. 94-3, Assessment of Eggners Ferry Bridge Navigation Light Failure.)  Dr. Leedy examined whether the *Miss Katie*'s allision and any resultant damage caused the *Delta Mariner*'s allision seventy-two days later. He consulted the records of Pennyrile Electric Cooperative Corporation to determine the daily kilowatt-hour ("kWh") consumption and determined "to a reasonable degree of engineering probability" that the lights functioned properly from October 27, 2011, until the *Miss Katie*'s allision on November 15, 2011.  (Docket No. 94-3 at 6.)  However, Dr. Leedy noted than on November 16, 2011—the day after the *Miss Katie*'s allision—the Bridge sustained "a larger kWh than normal consumption" that continued until December 26, 2011.  (Docket No. 94-3 at 6.)  He opined that this thirty-nine day increase in consumption "is definitely an anomaly caused most likely by electrical shorts in the bridge wiring."  (Docket No. 94-3 at 6.)  Dr. Leedy's report concluded that the outage of the navigation lights on the date of the *Delta Mariner*'s allision was caused by "one or more of the following events":

> 1.  Loose wiring connections caused by the impact damage of the *Miss Katie* collision.  Loose wiring can cause shorts to occur.

---

[3] Marquette notes that Hines offered no explanation as to how the breakers could have caused the outage, given that Span E's lights were working at the time of the second allision.  Marquette further observes that Hines did not explain how the *Miss Katie* allision may have damaged the breakers, as the breaker box is located on the r right descending shore, far from the point of contact with the Bridge.  (*See* Docket No. 89-1 at 12; Exhibit H-2)

    2. Breaks/cracks in the insulation caused by the impact damage of the Miss Katie collision. Breaks/cracks in the insulation can lead to shorts.

    3. Insulation deterioration caused by higher current levels than normal over a 39-day period after the Miss Katie collided with the bridge could have caused shorts to occur in the wiring leading to the navigation lights.

(Docket No. 94-3 at 10-11.)

At least at this stage of the litigation, Dr. Leedy's report raises a genuine issue of material fact as to proximate cause. "Generally, the existence of legal cause is a question of fact for the jury. It only becomes a question of law for the Court where the facts are undisputed and are susceptible of but one inference.'" *Cummins v. BIC USA, Inc.*, 835 F. Supp. 2d 322, 325-26 (W.D. Ky. 2011) (quoting *Johnson v. Triangle Insulation*, 2003 WL 2179867, at *2 (Ky. Ct. App. Aug. 1, 2003)). This principle also guides the Court's analysis of maritime cases, where proximate cause is a mixed question of fact and law. *See, e.g.*, *Ambraco, Inc. v. Project Europa MV*, 119 F. App'x 676, 677 (5th Cir. 2005) ("Questions of proximate cause and negligence, in admiralty cases, are questions of fact subject to review under the clearly erroneous standard."); *see also Exxon Co, U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 841 (1996) ("The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review.").

    **b. Did KYTC negligently respond to the *Miss Katie*'s allision?**

According to Marquette, KYTC was aware of repeated instances of the lights' failure. In a December 15, 2011 letter, the Coast Guard advised Mr. Hines of "multiple reports from commercial mariners that the [Bridge's] navigation lights are not operating properly or the lights are extinguished," creating an "unacceptable navigational hazard to river traffic." (Docket No. 89-8, Letter from Coast Guard Bridge Administrator Eric Washburn to Tom Hines.) Enclosed was a copy of the Permit and the revised lighting diagram. (*See* Docket Nos. 89-9, 89-10.) LeFevre—the chief district engineer and Hines' supervisor—initially received the letter, then called Hines to his office to review it. However, Hines understood the letter to refer to only one light that was not working. Hines admits to this oversight,

explaining that he "[p]ossibly reviewed the letter very quickly and missed the lights. . . . I guess when I scanned over the first part of it, I missed 'lights.'" (Docket No. 89-4 at 50.) However, he initiated no increased efforts to ensure that lights on bridges remained functional. (Docket No. 89-4 at 52.) Despite this notice, Marquette argues, KYTC attempted only to "reset the breakers," making no effort to otherwise repair the defect.

The Third-Party Plaintiffs' response again offers additional information and raises issues of fact, rendering summary judgment inappropriate. According to Hines and LeFevre, for approximately sixty-two days of the seventy-two day period between the allisions, the Bridge's navigation lights were functional. Accordingly, they argue that rather than presenting an obvious problem, the situation developed slowly as the lights consumed increasingly more power. KYTC personnel learned of the issue several weeks later, when work crews began the repair process. (*See* Docket No. 94-3, Leedy Report.) On January 23, Hines received notice that the Bridge's lights were out. He tried to reset the Bridge's breakers, but discovered that neither of them would "hold." (Docket No. 89-4 at 72.) The following day, Hines and his crew worked on the lights, eventually causing the upstream lights to "hold." (Docket No. 89-4 at 21; Docket No. 89-5 at 73-74.) Ford also recounted the crew's troubleshooting efforts prior to the second allision. (*See* Docket No. 94-5 at 43-44.) Although KYTC personnel worked on the Bridge to discern the outages' cause, weather hazards forced them to stop work in late January 2012. During this repair period, KYTC requested that the Coast Guard notify nearby mariners of the deficiency; as a result, a series of notices was broadcasted twice daily to warn vessels of the Bridge's outages. (Docket No. 94-1 at 2; *see* Docket Nos. 51-14, Broadcast Notices to Mariners.)

In light of the questions of fact raised in the deposition testimony and other exhibits, the Court is unable to find as a matter of law that the Third-Party Plaintiffs negligently responded to the *Miss Katie*'s allision. Because this issue is better left to a fact-finder at this time, the Court will deny summary judgment on this basis.

### c. Was KYTC's training deficient?

Finally, Marquette alleges that KYTC inadequately trained the individuals responsible for maintaining the Bridge's lights. According to Marquette, Hines had been responsible for the Bridge's navigation lights for approximately one year at the time of the first allision. (Docket No. 89-4, Excerpts from April 16, 2012, U.S. Coast Guard Public Hearing, at 23.) He admitted that although his department was responsible for ensuring that the Bridge's navigation lights complied with the Permit, he had no training related to bridge administration. (Docket No. 89-4 at 15.) At a Coast Guard hearing regarding the *Delta Mariner* allision, Hines acknowledged that until the second allision, he did not know that the Permit required the KYTC to maintain three vertical white lights on the Bridge's main navigation span. He stated that he did not learn of this requirement until the day following the allision. (Docket No. 89-4 at 18.)

Marquette also points to Steve Smith, an electrician, who serves as superintendent of the three-person traffic crew for the region encompassing the Bridge. (Docket No. 89-6, Excerpts from Deposition of Steve Smith, June 12, 2014.) Smith testified that he had not been provided with KYTC guidelines concerning maintenance of bridge lights or with a lighting diagram prior to January 26, 2012. (Docket No. 89-6 at 31-33.) Although he learned early in his career that three white lights marked the Bridge's main channel, he did not convey that information to the technicians under his supervision. (Docket No. 89-6 at 9-10.)

The testimony of Randy Williams, who served as regional traffic and permits manager, echoed that of Smith. Williams averred that he recalled no training or written instructions regarding the lighting requirements for bridges, nor did he provide such training to the signal crew that he supervised. (Docket No. 89-7, Excerpts from Deposition of James Randall Williams, at 51-52.) He could not recall ever encountering either the Permit or the lighting diagram for the Bridge. (Docket No. 89-7 at 8.)

Whatever the merits of Marquette's argument, the Court is in no position to determine what constitutes adequate training for those charged with maintaining and inspecting the Bridge's navigational lights or its effect on causation at this time.  This matter, like those discussed *supra*, requires additional development and is best evaluated decided by the fact-finder.

Resolving all ambiguities in favor of the Third-Party Plaintiffs, the Court cannot definitively say that the *Miss Katie* allision had no bearing upon the Bridge's navigational lighting at the time of the *Delta Mariner* accident.  Each of Marquette's arguments involves genuine issues of material fact, rendering summary judgment inappropriate.  Of additional importance is that at the time of filing, the parties had exchanged paper discovery and begun deposing witnesses; however, the discovery period does not end until June 1, 2015, pursuant to the Court's July 30, 2014, scheduling order.  (*See* Docket No. 93.) Likewise, the joint investigation by the United States Coast Guard and the National Safety Transportation Board remains pending, with materials still yet to be collected.  (*See* Docket No. 51-2 through Docket No. 51-15.)  Key witnesses had not yet been deposed at the time of the parties' briefing.  Additional discovery regarding causation is needed.  Accordingly, the Court declines to render any judgment at this time.

II.     **Marquette's motion for summary judgment concerning superseding cause is denied.**

According to Marquette, the KYTC knew of persistent problems with the navigation lights but failed to repair them over the seventy-two days between the two allisions.  Marquette argues that even if its own negligence damaged the Bridge's lights or electrical system, it was not foreseeable that KYTC would violate federal regulations and the Coast Guard Permit, would overlook the Coast Guard warning letter, and would fail to repair the lighting system for over two months.  Consequently, the Company contends that KYTC's putative negligence was a superseding cause of the *Delta Mariner*'s allision, severing Marquette from the chain of causation.  For purposes of the instant motion, the Court will assume that Marquette's negligence caused the *Miss Katie*'s allision and that the Third-Party Plaintiffs negligently failed to inspect and repair any resultant damage.  If the Third-Party Plaintiffs' alleged

negligence operates as a superseding cause, Marquette will be relieved of liability, regardless of whether its own negligence was a substantial factor in causing the *Miss Katie*'s allision.

The elements of negligence under maritime law generally echo those of a common law negligence action: duty, breach, causation, and damages. *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 F. App'x. 914, 919 (6th Cir. 2004) (citing *Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir. 2001); 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-2 at 183 (4th ed. 2004)). Traditional principles of comparative fault also apply: "When two or more parties have contributed by their fault to cause property damage in a maritime collision . . . liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault." *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975). Whether a party may be liable for damages hinges upon whether its actions were a proximate cause of the injury. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837-38 (1996) ("'There is properly no apportionment of comparative fault where there is an absence of proximate causation.'") (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-66 (2d ed. 1994)).

A superseding cause, however, intervenes to relieve an actor from liability, whether or not that actor's antecedent negligence was a substantial factor in causing the harm. *See* Restatement (Second) of Torts § 440, Comment b (1964). "The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. It is properly applied in admiralty cases." *Sofec, Inc.*, 517 U.S. at 837 (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-66). Foreseeability is the key consideration in this analysis: if the causal link between the two events is exceedingly attenuated, it is assumed that the outcome was sheer happenstance rather than the result of the antecedent negligence. *See Sofec*, 517 U.S. 830, at 838-39 ("Thus, if the [negligent] destruction of the Michigan Avenue Bridge had delayed the arrival of a doctor, with consequent loss of a patient's life, few judges would impose liability." (quoting *Petition of Kinsman Transit Co.*, 338 F.2d 708, 725 (2d Cir. 1964)).

11

Section 442 of the Restatement (Second) of Torts sets forth the following factors used to determine whether an intervening force constitutes a superseding cause:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

Restatement (Second) of Torts §442 (1964).  An intervening negligent act is not a superseding cause if:

(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Restatement (Second) of Torts § 447 (1964).

"[T]he intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm."  Restatement (Second) of Torts §443 (1964). Here, Marquette contends that the only intervening force between the *Miss Katie*'s allision and that of the *Delta Mariner* was the KYTC's alleged failure to timely repair the damage caused by the first accident. The Court cannot say that it was unforeseeable to Marquette that the electrical damage that resulted from *Miss Katie*'s allision would not be immediately observable and thus not immediately repaired.  Nor was it unforeseeable that a damaged electrical system and failing navigational lights could result in subsequent allisions caused by the insufficiently illuminated Bridge.  Assuming that Marquette's negligence caused

12

the outage, it remains a liable party unless an intervening force yielded extraordinary negligence. *See Matter of Crounse Corp.*, 956 F. Supp. 1392 (W.D. Tenn. 1996) (citing *Sofec*, 517 U.S. at 830). "[A]nything less than extraordinary negligence . . . is insufficient to operate as a superseding cause." The Court perceives no such extraordinary negligence here.

Sixth Circuit precedent confirms that this matter should be resolved at trial: "'There is eminent authority in support of the proposition that issues of negligence are ordinary not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner.'" *Daughenbaughv. Bethlehem Steel Corp.*, 891 F.2d 1199, 1205 (6th Cir. 1989) (quoting *Rogers v. Peabody Coal Co.*, 342 F.2d 749, 751 (6th Cir. 1965)). *See also Rupert v. Daggett*, 695 F.3d 417, 427 (6th Cir. 2012) ("Whether an intervening negligence act of a third person constitutes a superseding proximate cause is a question for the jury."). Based on what is now before the Court, it cannot say that the alleged negligence of others superseded the alleged negligence of Marquette as a matter of law.

## Conclusion and Order

The Court having considered the parties' arguments and finding that genuine issues of material fact persist, and being otherwise sufficiently advised, IT IS HEREBY ORDERED that Marquette's motion to dismiss or, in the alternative, motion for summary judgment, (Docket No. 89), is hereby DENIED.