UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00021-GNS-LKK

In the Matter of the Complaint of FOSS
MARITIME COMPANY, as Owner and
FOSS ATLANTIC, INC., as Operator and
Owner, *pro hac vice*, of the M/V DELTA
MARINER, Official No. 1094576, for
Exoneration from or Limitation of Liability

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon the Motion for Partial Summary Judgment filed by Foss Atlantic, Inc., and Foss Maritime Company ("Foss") (DN 100). The Commonwealth of Kentucky Transportation Cabinet ("KTC") has responded (DN 104), and Foss has replied (DN 107). Fully briefed, the matter stands ripe for decision. For the reasons set forth below, the motion is **GRANTED IN PART AND DENIED IN PART**.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit concerns two allisions involving the Eggners Ferry Bridge ("the Bridge"), owned by KTC and situated in the Kentucky Lake portion of the Tennessee River. The first occurred on November 15, 2011, as the *M/V Miss Katie*, owned and operated by Marquette Transportation Company, LLC ("Marquette"), traveled northbound on the Tennessee River. While attempting to negotiate Span E of the Bridge, the *Miss Katie* struck the center portion of the span.[1] Marquette alleges that the Bridge's navigation lights failed to comply with the U.S.

---

[1] This allision is the subject of *Allianz Global Risks US Insurance Co. v. Marquette Transportation Co., LLC*, Civil Action No. 5:12-CV-00168-GNS-LKK, also pending before this Court.

1

Coast Guard Bridge Permit ("the Permit") governing the Bridge's operation and with federal law, as only Span E was illuminated as required.

In a December 15, 2011, letter addressed to Thomas Hines ("Hines")—the supervisor of permits and traffic for District One of KTC—the U.S. Coast Guard advised KTC of "multiple reports from commercial mariners that the [Bridge's] navigation lights are not operating properly or the lights are extinguished," creating an "unacceptable navigational hazard to river traffic." (Pet'rs' Mot. for Partial Summ. J. Ex. A, DN 100-2). The letter requested Hines' "urgent attention" in bringing the Bridge's lights into compliance. (Pet'rs' Mot. for Partial Summ. J. Ex. A). Enclosed were copies of the Permit and the revised lighting diagram. (Pet'rs' Mot. for Partial Summ. J. Exs. A-1 to A-2, DN 100-3 to 100-4). James LeFevre—the chief district engineer and Hines' supervisor—initially received the letter, then called Hines to his office to review it. Hines, however, thought that the navigation lights were operating properly and understood the letter to indicate that he "needed to get red reflective panels ordered to get the bridge up to its current lighting plan." (Pet'rs' Mot. for Partial Summ. J. Ex. G at 5-6, DN 100-10).

Seventy-two days after the first allision, Foss's vessel, the *M/V Delta Mariner*, sustained a similar accident. Foss alleges that only Span E's navigational lights were illuminated on the night of January 26, 2012. When the *Delta Mariner* attempted to pass under the Bridge through Span E, its mast struck the Bridge's span, which collapsed onto the vessel's bow and into the riverbed. Foss alleges that the lack of functional navigation lights on the Bridge proximately caused the allision.

Foss instituted this limitation action seeking exoneration from, or limitation of, liability. (Compl., DN 1). Several parties filed claims related to the allision, including residents who

allege losses related to interruption of their usual travel routines, restaurant owners who allege the loss of travel-related business, and a telecommunications company that had a fiber optic cable severed by the accident. (Claims, DN 8, 11, 14-16). Additionally, as the owner of the Bridge, KTC filed a claim for the cost and expense of replacing the demolished span. (Claim, DN 12).

At the time it answered KTC's claim, Foss simultaneously filed a counterclaim against KTC and a third-party complaint against Defendants Hines and LeFevre. (Pet'rs' Countercl. & Third-Party Compl., DN 22). Foss alleges that the *Delta Mariner*'s allision was caused by the absence of functional navigation lights on the Bridge, in violation of federal regulations and the Permit governing the Bridge's operation. According to Foss, these lights were extinguished due to the negligent acts and omissions of Hines and LeFevre, who purportedly failed to inspect, maintain, and repair them as required. (Pet'rs' Countercl. & Third-Party Compl. ¶¶ 13-19, DN 22). For their part, LeFevre and Hines deny that the extinguished navigational lights contributed to the accident; rather, they instead allege that Foss's own crewmembers' negligence in operating the *Delta Mariner* caused the accident. (Third-Party Defs.' Answer to Countercl. 2, 3, DN 62). The Third-Party Defendants also filed a third-party complaint against Marquette, alleging that the *Miss Katie*'s allision damaged the bridge's lights and electrical system, thus causing the *Delta Mariner*'s allision. (Third-Party Compl. ¶ 8, DN 73).

Foss now moves for partial summary judgment applying the Pennsylvania Rule and the doctrine of negligence *per se* to KTC's alleged failure to comply with federal regulations and the Permit governing its operation of the Bridge.

## II. JURISDICTION

This Court has jurisdiction of this matter because it arises under admiralty law. *See* 28 U.S.C. § 1333.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact . . . ." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his positon; instead, he must present evidence on which the trier of fact could reasonably find for him. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## IV. DISCUSSION

In the instant motion, Foss seeks to invoke the *Pennsylvania* rule. This doctrine holds that "when a statutory rule intended to prevent an admiralty accident exists and a party violates that statute injuring a party whom the statute was created to protect, the violating party, to avoid liability, must show that its violation could not have been the cause of the accident." *Pearce v. United States*, 261 F.3d 643, 648 (6th Cir. 2001) (citing *The Pennsylvania*, 86 U.S. 125, 136 (1873)) (emphasis omitted). In other words, the *Pennsylvania* rule imposes a higher standard of proof, creating a presumption that a party's violation of legislative rules—here, the Bridge Permit and the U.S. Coast Guard regulations—contributed to the damage at issue. *See Great Am. Ins. Co. v. United States*, 552 F. Supp. 2d 703, 709-10 (W.D. Ohio 2008) ("Under the *Pennsylvania* presumption, one who violates a statutory rule intended to prevent collisions is presumed to be the contributing, if not the sole, cause of the incident.") (citations omitted).

Established in 1873 and originally directed at vessels, courts have since applied the rule "not only to ships, but also to those who do not properly mark an object in navigable waters." *Gele v. Chevron Oil Co.*, 574 F.2d 243, 247 (5th Cir. 1978) (citation omitted). The principle extends to the context of bridge/vessel allisions. *See, e.g.*, *Fla. E. Coast Ry. Co. v. Revilo Corp.*, 637 F.2d 1060, 1066 (5th Cir. 1981); *Feeder Lien Tow Serv., Inc. v. Toledo P. & W. R.R. Co.*, 539 F.2d 1107, 1111 (7th Cir. 1976). It is not necessary that Foss demonstrate that the alleged violation actually caused the accident. *See Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 364 (6th Cir. 2010) (noting that the *Pennsylvania* rule "place[s] [the] burden on the party in breach of a navigational statute to prove that its violation could not have been a contributing cause."). Instead, three elements trigger the rule's application: "(1) proof by a preponderance of evidence of violation of a statute or regulation that imposes a mandatory

duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Folkstone Maritime Ltd. v. CSX Corp.*, 64 F.3d 1037, 1047 (7th Cir. 1995) (citing *United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1116-17 (5th Cir. 1985)).

  The first element is easily satisfied here. Congress has required the owners and operators of bridges to maintain "such lights and other signals thereon" as prescribed by the Commandant of the U.S. Coast Guard. 33 U.S.C. § 494. Accordingly, KTC bore the duty to comply with all lighting requirements for the Bridge as found in 33 C.F.R. § 118, which establishes the U.S. Coast Guard's requirements for bridge lighting on navigable waters. The regulations provide that "[l]ights shall be displayed from sunset to sunrise and at other times when the visibility is less than one mile." 33 C.F.R. § 118.55(a). Furthermore, the required lights "must be securely attached to the structure and of sufficient candlepower as to be visible against the background lighting at a distance of at least 2,000 yards 90 percent of the nights of the year." 33 C.F.R. § 118.60. The U.S. Coast Guard requires bridges to display certain lights to designate the navigable channel. *See* 33 C.F.R. § 118.65(a) ("Each fixed bridge span over a navigable channel shall be lighted so that the center of the navigable channel under each span will be marked by a range of two green lights, and each margin of each navigable channel will be marked by a red light . . . ."). The regulations further authorize the District Commander to prescribe that "fixed bridges having two or more spans over a navigable channel shall have the main channel span marked with a set of three white lights arranged in a vertical line directly above each green light on the main channel span." 33 C.F.R. § 118.65(c).

  The Bridge Permit issued by the U.S. Coast Guard governed the specific conditions relating to the Bridge's maintenance and operation, establishing a specific configuration of lights

and reflective panels.² A diagram illustrating the placement of these lights accompanied the Bridge Permit, with three white lights to indicate the main navigation span at Span B, along with red and green lights marking each span and pier. (Pet'rs' Mot. for Partial Summ. J. Ex. A-2, DN 100-4). The Permit required the lights and panels to be displayed nightly, from sunset to sunrise, and sufficiently luminous "as to be visible against the background lighting at a distance of at least 2,000 yards 90% of the night of the year." (Pet'rs' Mot. for Partial Summ. J. Ex. A-1, DN 100-3). It further required KTC to establish a "continuing program of inspection and maintenance . . . to insure that the lights and panels are properly displayed." (Pet'rs' Mot. for Partial Summ. J. Ex. A-1, DN 100-3). There can be no doubt that the obligations imposed by the relevant U.S. Coast Guard regulations at 33 C.F.R. § 118, *et seq.* and the Bridge Permit imposed mandatory duties upon KTC to maintain the specified lighting scheme.

Numerous members of the *Delta Mariner*'s crew testified that at the time of the vessel's allision, only Span E's navigational lights were illuminated; all other spans, including the main

---

² The Bridge Permit specifies the following requirements, in relevant part:

> The center of the channel spans "B", "C", "D", and "E" shall be marked by a range of two green lights. . . . The upstream and downstream sides of the main navigation span (Span "B") shall be marked with a tier of three white lights arranged in a vertical line directly above the corresponding green light. Each white light shall show through a horizontal arc of 180 degrees and shall be mounted to show 90 degrees on either side of a line parallel to the axis of the channel so as to be visible from an approaching vessel. . . . The upstream and downstream sides of piers 2,3, 4, 5 and 6 shall be marked with red lights. . . . the upstream and downstream sides of piers 2, 3, 4, 5, and 6 shall be marked with red high intensity grade retro-reflective square panels which measure two feet per side. This retro-reflective material should be place[d] above or near the red lights so as to effectively reflect the searchlight of an approaching vessel.

(Pet'rs' Mot. for Partial Summ. J. Ex. A-1, DN 100-3).

navigation span, were unlit.[3]  KTC has presented no evidence that would call this testimony into question.  Accordingly, the Court concludes that because KTC failed to comply with the Coast Guard's navigational lighting scheme, it was in violation of the relevant regulatory provisions.

Both the second and third elements are also readily satisfied.  The Court finds that the navigational light scheme was intended to avert the very harm that resulted here—that is, nighttime allisions between a vessel and the Bridge.  *See Union Pac. R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 675 (8th Cir. 2002) (noting that a bridge owner's failure to maintain the required lights greatly increases the risk of allision and justifies application of the *Pennsylvania* rule).  Because all three elements are satisfied, the Court will apply the *Pennsylvania* rule to KTC's violation.

Importantly, the *Pennsylvania* rule does not establish fault, but merely shifts the burdens of proof to KTC.  *See Candies Towing Co., Inc., v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir. 1982) (noting that the rule "does not render immaterial negligence, fault, or damages, but does impose a substantial burden upon the party at fault in proving its innocence.")  To rebut the presumption, KTC must prove "not only that the violation was not in fact the cause of the

---

[3] Chief Mate John Newland testified that on the night of the allision, only one span was illuminated; he presumed that the single lit span was the preferred channel span for navigation. (Newland Dep. 145:15-18, 157:21-23, DN 100-6).  Third Mate Franklin Altany stated that he observed only red and green lights, with no white lights indicating the main navigation span. (Altany Public Test. 520:18-20, 526:8-10, 601:13-14, DN 100-7).  Michael Collins, a river pilot, agreed that only two red lights and one green light were lit.  (Collins Public Test. 4, DN 100-9). Collins, who operated the vessel's spotlight, said, "I lit up what I perceived to be the channel span, when I seen [sic] the lights I knew that wasn't the channel span, I looked at the next one over and I though[t] well[,] that was the channel span.  That's what I thought was the channel span.  I directed them to go to the next span over to the right because it had the lights on it." (Collins Public Test. 4, DN 100-9).  Finally, Captain Lloyd Patten, master of the *Delta Mariner* on the evening of the accident, also attested that just before the allision, only the two red lights and one green light of Span E were lit.  Patten stated that he could not see the rest of the bridge. He concluded that "if the bridge had been lighted correctly, none of us would be here today.  I view [the incorrect lighting] as the main cause of this accident." (Patten Public Test. 5, DN 100-8).

accident, but that the violation *could not* have been a cause of the accident." *Grosse Ille Bridge Co. v. Am. Steamship Co.*, 302 F.3d 616, 622 (6th Cir. 2002) (citing *The Pennsylvania*, 86 U.S. at 136). Presently, the Court makes no judgment regarding KTC's ability to rebut this presumption. The agency devoted a substantial portion of its briefing to allegations that Foss's own negligence exclusively caused the accident.[4] Despite the breadth of such allegations, however, the Court need not address them at this stage. Trial of this matter will afford KTC an opportunity to rebut the *Pennsylvania* presumption.

KTC urges the Court to apply the *Reliable Transfer* doctrine rather than the *Pennsylvania* rule. Until 1975, when two vessels shared the blame for a collision, damages were divided among the parties; if three or more vessels were involved, the damages were split equally among them. In *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), the Supreme Court abandoned this "divided damages" rule in favor of comparative negligence, allocating liability among the parties in proportion to their degree of fault. *See id.* at 411 ("[W]hen two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault . . . .").

Contrary to KTC's argument, however, *Reliable Transfer* did not supplant the *Pennsylvania* rule. The two doctrines accomplish different ends: the *Pennsylvania* shifts the burden of proof, while *Reliable Transfer* clarifies that each party's fault must be proportionately measured. *See Fla. E. Coast Ry. Co.*, 637 F.2d at 1067 (citing *S. Pac. Transp. Co. v. Tug*

---

[4] Among these allegations, KTC claims that the *Delta Mariner* crew violated various navigation rules, disregarded a broadcasted notice alerting mariners that the Bridge's lights were faulty, and improperly utilized its navigation equipment and paper charts; it also claims that the *Delta Mariner*'s river pilot intended to traverse Span C rather than Span B. (Def.'s Resp. to Mot. for Partial Summ. J. 4-5, 7-9, DN 104).

9

*Captain Vick*, 443 F. Supp. 722, 732 (E.D. La. 1977)). As the Fifth Circuit has explained, the two principles do not represent binary alternatives.

> Although application of the rule imposes a heavy burden of proof, that is all it does. It does *not* determine a party's ultimate share of liability for a loss. Accordingly, this Court has repeatedly held that *The Pennsylvania* rule has survived the Supreme Court's adoption of a comparative fault scheme for maritime matters. As former Chief Judge Brown has put it, "[the] rule still floats, in the wake of *U.S. v. Reliable Transfer*, which only overruled *The Pennsylvania* on the point of allocating comparative fault."

*Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991) (citations omitted). At this stage, the Court makes no judgment as to the parties' respective percentages of fault. Should the evidence presented at trial indicate that KTC and Foss share fault, the Court will apportion liability between them in accordance with *Reliable Transfer*. *See id.* (citing *Sheridan Transp. Co. v. United States*, 834 F.3d 467, 478 (5th Cir. 1987) ("The rule of *The Pennsylvania* concerns only the burden of proof for showing causation; it does not determine ultimate liability for damages.")).

Finally, Foss argues that KTC's violations render it negligent *per se*. In the context of the Jones Act, "a violation of a Coast Guard regulation enacted for the safety of seamen and having a connection of the injury results in a finding of negligence *per se*, bars consideration of comparative negligence, and shifts the burden of disproving causation to the defendant." *Horton v. Andrie, Inc.*, 408 F. Supp. 2d 477, 479 (W.D. Mich. 2005). This case does not arise under the Jones Act, and it appears that no general rule of maritime law imposes negligence *per se* as a result of violation of a legislative mandate.[5] Accordingly, the Court will deny Foss's motion for summary judgment as to this doctrine.

---

[5] Foss provides only one example wherein a court applied the doctrine to an allision: *Great American Insurance Co. v. Army Corp. of Engineers*, an unreported case from the Southern

10

## V.    CONCLUSION

In accordance with the foregoing discussion, the Court finds that the *Pennsylvania* rule should be applied but declines to apply the doctrine of negligence *per se*. Therefore, having reviewed the parties' briefs and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** that Foss Atlantic, Inc. and Foss Maritime Company's Motion for Partial Summary Judgment (DN 100) is **GRANTED IN PART AND DENIED IN PART**.

**Greg N. Stivers, Judge**
**United States District Court**
July 14, 2015

cc:    counsel of record

---

District of Ohio. *See Great Am. Ins. Co. v. U.S. Army Corp. of Eng'rs*, No. 1:05CV205, 2008 WL 3833840 (S.D. Ohio Aug. 15, 2008).